IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

RALLS PROPERTIES LLC,        )
            )
        Plaintiff,        )    TC-MD 110558D
            )
      v.         )
            )
CLACKAMAS COUNTY ASSESSOR,    )
            )
        Defendant.      )    **DECISION**

Plaintiff appeals the real market value of property identified as Account 00527497 (subject property) for the 2010-11 tax year. A trial was held in the Tax Courtroom on March 15, 2012. Christopher K. Robinson appeared on behalf of Plaintiff. Mark Johnson (Johnson), who advised Mark Ralls (Ralls) in the sale of the subject property, and Rafael Martinez (Martinez), purchaser of the subject property, testified on behalf of Plaintiff. Rhett C. Tatum, Assistant County Counsel, appeared on behalf of Defendant. Ronald R. Saunders (Saunders), Registered Appraiser, testified on behalf of Defendant. Plaintiff's Exhibits 1, 2, 3, and 5 were offered and admitted without objection. Defendant's Exhibit A and F were offered and admitted without objection. Defendant's Exhibit G, three pages offered to "correct" pages in Saunders appraisal report (Exhibit A), were admitted over Plaintiff's objection.[1]

## I. STATEMENT OF FACTS

The subject property is the Gladstone Honda, located on SE McLaughlin Boulevard in Gladstone, Oregon. (Def's Ex A at 7.) "Southeast McLoughlin Boulevard is a heavily traveled north-south arterial which is developed primarily with retail oriented commercial uses. * * *

---

[1] Defendant initially offered Exhibit G to replace three pages in its Exhibit A. Plaintiff objected because those pages were not timely exchanged and argued that Exhibit A should remain as submitted. Saunders testified in response that the three pages were necessary due to earlier typographical errors that he failed to correct prior to exhibit exchange; they are not based on new information. Defendant proposed to submit the three pages under a new exhibit label, Exhibit G, with the original pages remaining in Exhibit A. The court admitted Exhibit G.

This market area has the highest concentration of auto dealerships in the Portland area, with approximately 30 new car dealership and used car lots along McLoughlin Boulevard." (*Id.* at 19.) The subject property site is 4.95 acres or 215,622 square feet, zoned "general commercial." (*Id.* at 7.) The subject property improvement is a 60,413 square feet, "one story with mezzanine, concrete tilt-up auto dealership building which was constructed in 2008." (*Id.*) Saunders determined that the subject property improvements were good quality and good condition as of January 1, 2010. (*Id.*) Plaintiff sold the subject property to Nezco Properties LLC on February 23, 2011, for $11,369,403, including "back taxes." (*Id.* at 9.) "At the time of sale, the seller [Plaintiff] was reported to be insolvent." (*Id.*)

A.    *Plaintiff's value evidence: marketing and sale of the subject property*

Johnson testified that he has experience with auto dealerships and was previously a licensed auto dealer in Washington. He now owns a "mergers and acquisitions firm" that specializes in the purchase, sale, and acquisition of properties. Johnson testified that he was referred to Ralls by a Seattle attorney. He testified that he was engaged by Ralls to help with the sale of the subject property and "advise" Ralls. Johnson could not recall the initial asking price for the subject property. He testified that the market was improving from 2009 to 2011, so the sale in February 2011 to Martinez would be a high indicator of value for January 1, 2010. Martinez testified that he has extensive experience in the auto dealer industry; he started selling cars in New York, operated dealerships in Chicago and California, and has owned 17 dealerships in the Pacific Northwest, with 26 years of experience on McLoughlin Boulevard.

Johnson testified that the subject property was marketed for about one year prior to sale and that he marketed it to those in the local auto industry as well as alternate users. (*See* Ptf's Ex 1.) He testified that he met with the entire board of directors of Kuni, "sat in the boardroom" for

lengthy discussions with Tonkin, and also met with Lanphere and Dick Hannah. Johnson testified that he invested 500 to 600 hours valuing and marketing the subject property. Johnson testified that he never "listed" the subject property, for example, online; that is not his typical practice. He testified that he usually focuses on local buyers because they are the most willing to add to their own dealerships. Martinez testified that he thought Johnson's marketing of the subject property was typical of the dealership industry.

Johnson testified that potential buyers responded that they do not need a 60,000 square foot building to sell cars; a larger building is more costly to maintain. He testified that a typical dealership includes a 25,000 to 30,000-square foot improvement. Martinez testified that only about 35,000 square feet are necessary; the excess area of the subject property is not being used.

Johnson testified that the sale of the subject property included, in addition to the real estate, the franchise, furniture, fixtures, and goodwill. Johnson and Martinez both testified that $10 million was the amount paid for the real estate and franchise. (*See* Ptf's Ex 2; Ptf's Ex 5 at 1-3 (Closing and Disbursement Statement and Asset Purchase Agreement).) Johnson testified that Plaintiff's lender had a secured interest in the real property and wanted to keep the real property and the franchise together; however, some buyers wanted only the franchise. Martinez testified that he was interested primarily in the Honda franchise and tried, first, to buy only the franchise. Johnson and Martinez both testified that the value of the Honda franchise was about $3 to $4 million, suggesting a price of $6 or $7 million for the subject property real estate.

Johnson testified that the "lender was driving the sale and the sale price." He testified that the "first thing" that he talked about with potential buyers was the fact that Ralls needed to get the deal approved by his lender. Johnson testified that, although the lender was driving the deal, the lender was interested in getting the maximum pay-off from the sale; the lender could

afford to wait to get a good deal. He testified that the manufacturer was also involved bringing in buyers, which is something that happens typically when the dealer is in financial trouble.

Defendant provided a letter from Ralls to Suzanne Warman, Senior Appraiser for Defendant, stating: "You have asked for the latest appraisal. That was done by Autostar, and they will not share it with me, or with Mark Johnson. Sorry I can't provide that. Autostar is very involved with the actual sale, as I owe them $16,700,000. Should they sell for the $10,500,000, I have a personal guarantee on the deficiency balance. Bad news." (Def's Ex F.)

Martinez testified that he was aware of Ralls' financial troubles and the $16.7 million debt to AutoStar and the debt to GMAC, but Ralls' financial situation did not affect his purchase price. Martinez testified that he did not consider the purchase a "fire sale." Johnson testified that he worked with lenders, including AutoStar, to accept less than the amount owed. The Third Amendment to the Asset Purchase Agreement states "AutoStar's affiliate, ASTAR Finance LLC has entered into an agreement dated August 18, 2010 with Seller and Owner * * * providing for the conditional release of Seller and Owner from all liability on obligations to it pertaining to financing of the Main Honda Facility and other debt." (Ptf's Ex 5 at 42.)

Saunders considered the February 23, 2011, sale of the subject property to be a "distressed sale" that is not indicative of its 2010-11 real market value. (Def's Ex A at 12.) He noted Plaintiff "was insolvent and lacked the funds to close the sale due to several existing liens. The purchaser agreed to assume or pay specific liabilities and obligations of the seller as part of the asset purchase agreement. It appears that this was a distressed sale and therefore is not considered in the valuation of the subject property." (*Id.*) The Asset Purchase Agreement states:

> "The Seller is insolvent and lacks funds to effectuate a closing of the sale of its assets free and clear of liens without the Purchaser agreeing to assume or pay specified liabilities and obligations of Seller as provided herein."

(Ptf's Ex 5 at 3.)  The Third Amendment to the Asset Purchase Agreement states:

> "Purchaser will assume, on terms previously received by Purchaser from Snap On Credit, LLC, Seller's obligations to Snap On Credit, LLC and its affiliates in an amount not to exceed $700,000."

(*Id.* at 41 (Assumed Liabilities).)

> "Purchaser, or its affiliate, will pay and/or assume the additional obligation of Seller or Seller's affiliate Gladstone Hyun, LLC to GMAC and its affiliates in an amount not to exceed $500,000, and to Snap On Credit, LLC in an amount not to exceed $200,000 pursuant to that certain Asset Purchase Agreement between Gladstone Hyun, LLC as Seller, Town & Country Imports II, Inc. (or an affiliate thereof) as Purchaser and Michael L. Ralls as Owner regarding the purchase and sale of the Nissan motor vehicle dealership known as Gladstone Nissan * * *."

(*Id.* at 7-8 (Assumed Liabilities).)  Martinez testified that the Asset Purchase Agreement covers the purchase of inventory and supplies; it is separate from the real estate

B.    *Defendant's appraisal*

Saunders testified that he relied on the cost and sales comparison approaches to value the subject property.  (*See* Def's Ex A at 43.)  He testified that he did not identify any good evidence upon which to complete an income approach analysis for the subject property.  Saunders concluded a reconciled real market value of $13,121,188 for the subject property.  (*Id.* at 61.)

1.    *Cost approach*

Saunders testified that he used the cost approach because the subject property was completed in September 2008, and was relatively new as of January 1, 2010.  He testified that one of the strengths of the cost approach is that it does not reflect the value of the franchise or goodwill, only the real estate.  Saunders testified that he concluded a land value of $17 per square foot, or $2,354,857, for the subject property land, based on four comparable land sales. (Def's Ex A at 48.)  Sale 1 is 36,678 square feet of "manufacturing" zoned land in Milwaukie that sold for $14.79 per square foot in May 2008.  (*Id.* at 44.)  Sale 2 is 55,757 square feet of

"PDC Commercial" zoned land in Wilsonville that sold for $14.99 per square foot in July 2009. (*Id.*) Sale 3 is 74,923 square feet of "commercial" zoned land in Portland that sold for $11.01 per square foot in February 2010. (*Id.*) Sale 4 is 54,886 square feet of "General Commercial District" land in Milwaukie that sold for $20.04 per square foot in September 2010. (*Id.*)

Saunders considered both the actual reported costs to complete the subject property improvements, $8,143,206 as of September 1, 2008,[2] and the Marshall Valuation Service cost estimator, under which Saunders determined a total replacement cost of $11,379,424. (Def's Ex A at 49-50.) Saunders' total replacement cost using the Marshall Valuation Service includes $8,293,592 for the "building"; $702,000 for the "site improvements"; $1,349,339, for "indirect costs"[3]; and $1,034,493, for "developer's profit." (*Id.* at 50.) Saunders deducted "2% accrued depreciation," or $227,588, and determined a depreciated replacement value of $11,151,836 for the subject property improvements. (*Id*. at 51.) Adding his land value of $3,665,574, Saunders concluded a total real market value of $13,121,188 for the subject property under the cost approach, less the values of tax lots 300 and 400. (*Id.*)

Martinez testified that he considers the subject property improvements to be much larger than necessary. Saunders testified that the large size of the subject property improvements could result in economic obsolescence, but he did not agree that it did because he identified at least three other dealerships that were about the same size or larger than the subject property.

///

///

---

[2] Saunders stated that costs increased by "approximately 3%" between September 1, 2008, and January 1, 2010, so Saunders determined actual costs of $8,387,502 as of January 1, 2010. (Def's Ex A at 49.)

[3] Saunders stated that "indirect costs were not provided," but include "financing charges, appraisal fees, land holding costs, environmental, seismic and geotechnical testing, systems development charges, interim property taxes, insurance and cost of in-house staff, etc." (Def's Ex A at 50.)

2.    *Sales comparison approach*

Saunders testified that he identified five "sales of similar automobile dealership propert[ies]" under the sales comparison approach. (Def's Ex A at 52.) The sales occurred between April 2008 and January 2011 with unadjusted prices per square foot ranging from $150.11 for the sale 3, the "Gladstone Auto Center" on McLoughlin Boulevard in March 2009, to $314.05 for the sale 5, the "Former Lincoln Mercury Dealership" in Portland in January 2011. (*Id.* at 53; Def's Ex G at 2.) Saunders' sale 2, which sold for $229.74 per square foot in June 2008, is the "Toyota Scion of Gladstone," also located on McLoughlin Boulevard. (*Id.*) Saunders made qualitative adjustments to each comparable sale and determined sales 1, 2, and 3 to be low indicators of value and sale 4 to be a high indicator; he "provided [sale 5] for information purposes only." (Def's Ex A at 59-60; Ex G at 2-3.) Saunders concluded a value range of $240 to $250 per square foot and concluded a value of $245 per square foot for a total value of $13,385,243, after subtracting the values of tax lots 300 and 400. (*Id.*)

On cross examination, Saunders agreed that, if his comparable sales included anything other than the real property (such as a franchise), the values indicated by the sales would be less.

The 2010-11 real market value of the subject property determined by the board of property tax appeals is $12,968,784, reduced from the roll real market value of $14,921,590. (Ptf's Compl at 2.) The 2010-11 maximum assessed value of the subject property is $11,806,660. (*Id.*) Plaintiff requests a 2010-11 real market value of $7.5 million, based on the sale of the subject property, less the value of intangible property included in the sale. Saunders concluded a 2010-11 real market value of $13.1 million, rounded, for the subject property. Defendant requests that the 2010-11 real market value be sustained.

/ / /

## II.  ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 tax year.  "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)).  Real market value is defined in ORS 308.205(1), [4] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2010-11 tax year was January 1, 2010.  ORS 308.007; ORS 308.210.

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]"  ORS 308.205(2).  There are three approaches of valuation that must be considered, although all three approaches may not be applicable: the cost approach, the sales comparison approach, and the income approach.  OAR 150-308.205-(A)(2)(a); *Allen v. Dept of Rev.*, 17 OTR 248, 252 (2003).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence.  ORS 305.427.  A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).  "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990).  "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties."  ORS 305.412.

---

[4] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

Plaintiff did not submit an appraisal report, relying instead on the February 23, 2011, sale of the subject property for $11,369,403. Plaintiff requests that the 2010-11 real market value be reduced to $7.5 million, which Plaintiff determined to be the sale price attributable to the real property. The lack of an appraisal is not fatal because "[t]he various approaches to valuation * * * are only the vehicles used to determine the ultimate fact – market value." *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973). "A recent sale of the property in question is important in determining its market value." *Id*. "If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sale price, while certainly not conclusive, is very persuasive of the market value." *Id*.

The February 23, 2011, sale of the subject property was not "recent" as of the January 1, 2010, assessment date. Johnson testified that the February 2011 sale is a high indicator of value as of January 1, 2010, because the market was improving from 2009 to 2011. Plaintiff provided no market evidence to support that testimony. Furthermore, it appears that the sale of the subject property was not "voluntary" because Ralls was insolvent and, as Johnson testified, Ralls' "lenders [were] driving the sale." Johnson testified, however, that the lenders were interested in getting the maximum pay-off from the sale and could afford to wait to get a good deal. Plaintiff noted that the subject property was marketed for about a year before sale. Defendant questioned whether the subject property was adequately exposed to the market because Johnson did not publically list the subject property, but rather identified and approached potential buyers. Johnson testified that that is his typical marketing practice with auto dealerships.

Plaintiff's reliance on the February 23, 2011, sale of the subject property is also problematic because it is unclear from the evidence what value was attributable to the real property. Johnson and Martinez both testified that the sale included a Honda franchise, the value

of which they determined to be about $3 to $4 million. It is unclear how they determined that amount. Saunders testified that franchise valuation is "very specialized" and Plaintiff provided no evidence to support its value conclusion other than the testimony of Johnson and Martinez. "Personal conclusions with no basis in actual market data are entitled to little or no weight." *McKee v. Dept. of Rev.*, 18 OTR 58, 64 (2004.) Saunders stated in his report that the subject property buyer "agreed to assume or pay specific liabilities and obligations of the seller as part of the asset purchase agreement." (Def's Ex A at 12.) The evidence provided indicates that the buyer assumed a total of up to $1.4 million in liabilities on behalf of Plaintiff. (Ptf's Ex 5 at 3, 7-8, 41.) Plaintiff did not account for assumed liabilities in its determination of real market value.

The court finds that the February 23, 2011, sale of the subject property was not a "recent, voluntary, arm's-length transaction" as of the January 1, 2010, assessment date. Plaintiff's requested value of $7.5 million is based on unsupported testimony concerning the value of the Honda franchise and fails to account for the liabilities assumed by the subject property buyer. Plaintiff has not established by a preponderance of evidence that the 2010-11 real market value of $12,968,784 set by the board of property tax appeals is in error. Saunders presented an appraisal report in which he determined 2010-11 real market value of $13.1 million, rounded, which also supports the 2010-11 real market value set by the board of property tax appeals.

### III. CONCLUSION

After considering the testimony and evidence presented, the court finds that Plaintiff has failed to meet its burden of proof. The evidence presented by Defendant supports the 2010-11 real market value of $12,968,784 set by the board of property tax appeals. Now, therefore,

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of July 2012.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on July 20, 2012. The Court filed and entered this document on July 20, 2012.*